1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11

**LOY ALLEN BOWMAN,**

Petitioner,

**v.**

**JOHN KATAVICH,**

Respondent.

Case No. 1:14-cv-00934 MJS (HC)

**ORDER REGARDING PETITION FOR WRIT OF HABEAS CORPUS**

12
13
14
15
16
17
18
19
20
21
22
23

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent is represented by Amanda D. Cary of the office of the Attorney General. Both parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 9, 11.)

**I.     Procedural Background**

24
25
26
27
28

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on September 22, 2011, for second degree murder with a firearm enhancement. (Clerk's Tr. at 691-93.)  On November 10, 2011, Petitioner was

1    sentenced to an indeterminate term of sixteen (16) years to life in state prison.  (Id.)

2           Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

3    District, which affirmed the judgment on October 22, 2013. (Lodged Docs. 11-14.)

4    Petitioner sought review from the California Supreme Court. (Lodged Docs. 15-16.) The

5    California Supreme Court denied review on January 15, 2014. (Id.)

6           Petitioner did not attempt to file collateral challenges to his conviction in state

7    court in the form of petitions for writ of habeas corpus.

8           On June 16, 2014 Petitioner filed the instant federal habeas petition. (Pet., ECF

9    No. 1.) Petitioner presented three claims for relief in the petition: (1) that the trial court

10   violated his due process rights by not providing a self-intoxication defense instruction; (2)

11   that the trial court violated his due process rights by not providing an instruction on the

12   lesser-included defense of involuntary manslaughter; and (3) that the restitution fines

13   imposed were unconstitutional. (Id.)

14          Respondent filed an answer to the petition on August 13, 2014. (ECF No. 11.)

15   Petitioner did not file a traverse. The matter stands ready for adjudication.

16   **II.    Statement of the Facts**[1]

17          INTRODUCTION

18          David Smith's body was found on the side of the road in a rural
     area in Fresno County. He had been shot multiple times, and suffered
19   extensive blunt force trauma to his head. The investigation led to
     appellant/defendant Loy Allen Bowman IV and Marcos Eli Flores. They
20   were Smith's acquaintances and purchased crystal methamphetamine
     from him. Flores testified that he entered into a plan with defendant to lure
21   Smith into a secluded area and beat him, because they were angry about
     a particular drug transaction. Flores said defendant shot Smith with a rifle
22   and then used the weapon to repeatedly beat Smith in the head.

23          Both defendant and Flores were initially charged with first degree
     murder (Pen. Code,[fn1] § 187, subd. (a)). The court granted the
24   prosecution's motion for severance of their trials. Flores later pleaded
     guilty to second degree murder. He was sentenced to 36 years to life, and
25   he agreed to testify against defendant.

26          **FN1**: All further statutory citations are to the Penal Code unless otherwise

27   _____
     [1] The Fifth District Court of Appeal's summary of the facts in its October 22, 2013 opinion is presumed
28   correct.  28 U.S.C. § 2254(e)(1).

2

indicated.

At defendant's jury trial for first degree murder, Flores testified that defendant shot and beat Smith. Defendant testified to a different version of the story – that Flores shot and beat Smith. Defendant was convicted of second degree murder. The jury found true the special allegation that a principal was armed with a firearm in the commission of the offense (§ 12022, subd. (a)(1)). However, the jury found not true the allegation that defendant personally and intentionally discharged a firearm which caused death (§ 12022.53, subd. (d)), thus convicting defendant as an aider and abettor and not as the gunman.

Defendant was sentenced to 15 years to life, plus one year for the firearm allegation. The court imposed a restitution fine and ordered restitution to the victim's family for his funeral expenses.

On appeal, defendant contends the court should have granted his motion to instruct the jury on voluntary intoxication. Defendant also contends the court had a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense. In addition, defendant argues he was entitled to a jury trial on imposition of both victim restitution and the restitution fine. We affirm.

FACTS

At 7:00 a.m. on March 18, 2009, Fresno County Sheriff's deputies responded to a rural area on Yuba Avenue near Highway 180, in response to a dispatch that a man was lying on the side of the road. The deputies found David Smith's body lying face-down in the mud and dirt adjacent to an orchard. There was blood around his body. He suffered gunshot wounds to his left chest, arms, and legs, and blunt force trauma to his face and head.

The detectives found tire and shoe tracks near Smith's body. There were signs in the dirt of significant movement consistent with a disturbance and fight. The barrel of a .22-caliber rifle was found just off the roadway. The rest of the rifle – the stalk, receiver, and trigger parts – were broken in pieces and scattered in the dirt around Smith's body. There was also .22-caliber live ammunition and spent shell casings lying in the dirt. Smith's property was found around and under his body, including his wallet, a partially open folding knife, a checkbook with a bullet hole through it, and a cell phone which had been broken into pieces.

Shoe and tire tracks

The detectives were able to isolate three different sets of shoe tracks in the mud around the victim's body. One set belonged to the shoes on the victim's body. The second set was from a DVS brand shoe. The third set was from a pair of work boots.

Based on the tire and shoe tracks, the detectives believed that a vehicle had parked on the side of the road and three people emerged from it. The driver was wearing the work boots, the front passenger was wearing the DVS brand, and Smith got out of the rear passenger door.

3

The detectives also determined the significant disturbances in the dirt were consistent with a fight. The broken pieces of the cell phone and rifle were consistent with the victim being bludgeoned by the objects, and the objects breaking into pieces and flying off during the beating. The tracks from the work boots were "dug in" to the dirt, indicating that person exerted so much force that the work boots wiped out any other shoe tracks underneath them. The person who wore the "DVS" brand shoe walked toward the area of the victim's body, but the work boot tracks were on top of the DVS tracks. The highest frequency of tracks around the victim's body was from the work boots, which indicated that person was involved in the physical disturbance with Smith.

The tire tracks and blood trails indicated that after the disturbance, the vehicle initially drove forward over the victim, then "the vehicle backed over him, and then [it] went forward over him again" and left the scene.

The autopsy

Smith had been shot in his upper left chest and in both arms and legs. The bullet fired into his chest went through the upper lobe of the left lung, and lodged in his upper left back. The left lung collapsed and extensive internal bleeding occurred. There were also bullets lodged in both legs near the knees. The bullets into his arms went through and one bullet fractured his right arm. The bullets were either .22- or .25-caliber.[fn2] Smith also suffered blunt force trauma, abrasions, and lacerations on his face, head, and body. Some of the lacerations on his body were defensive wounds. Smith had a skull fracture, and multiple rib fractures on the left side. The head trauma and lacerations were inflicted by a heavy, linear object that was long and narrow.

**FN2**: A criminalist determined the broken rifle found at the scene was a Marlin .22-caliber semiautomatic long rifle. The spent cartridge casings were consistent with being fired from that weapon. The criminalist also found blood on pieces of the broken rifle.

Smith also had multiple fractures to the left rib cage, a laceration on the inside of his right lung, and a laceration on the front wall of his heart. These injuries were probably caused by being run over by the pickup truck. Smith suffered internal bleeding from the rib fractures.

The cause of Smith's death was the combination of the gunshot wound to the chest and the blunt force injuries to his head, neck, chest, and abdomen. The gunshot wound in the left chest would have solely caused Smith's death in about 20 to 30 minutes, if left untreated. The head injuries were inflicted with so much force that Smith suffered extensive subgaleal hemorrhages.

Initial contacts with defendant and Flores

The detectives determined Smith was connected to an apartment on East Harrison in Fresno. On the evening of March 18, 2009, Detectives Eaton and Toscano went to the apartment and met defendant and his girlfriend. Defendant said Smith had lived in the apartment with him. Defendant also said Smith hung out with several people, including Marcos Flores.

On the night of March 19, 2009, the detectives went to a house associated with Marcos Flores, but no one was home. The detectives saw a pickup truck parked in front of the house. The detectives believed the truck's tires matched the distinctive tire tracks found near Smith's body.

Defendant asks Macias for help

On or about March 21, 2009, defendant called a friend, Pamela Macias. Defendant sounded scared. He asked Macias to pick him up and said he was in a little bit of trouble. Macias picked up defendant and his girlfriend, and took them to her own residence. Defendant was very scared, edgy, and sweating profusely. Macias had never seen him act that way. Defendant said the police had been to his house, and he did not want to be questioned, but he did not have any place to go.

Macias testified defendant did not say what kind of trouble he was in, but that he would be "gone for a long time." Defendant asked Macias how many sleeping pills it would take for him not to wake up. Macias told him not to do that. Defendant told Erick Jones, Macias's boyfriend, that he was "in the worst possible trouble that you could possibly imagine."[fn3] Macias and Jones asked defendant whether he should turn himself in. Defendant said it wouldn't be a good idea because "it wasn't an accident." Defendant said he was "doomed pretty much. It wasn't an accident. Turn yourself in, it's all bad."

**FN3**: Jones testified for the prosecution and admitted he had prior convictions for forgery and domestic violence, and he was in custody at the time of trial.

Macias testified defendant said he turned off his cell phone so the police could not call or track him. Defendant told Jones that he was going to get rid of his cell phone so no one could track him. Jones thought defendant was under the influence of methamphetamine. Defendant talked about going to Canada or Mexico to avoid being questioned by the police. He made some calls to people out of state. Defendant did not say why he was afraid. Macias gave him some money, and defendant left the next morning.

Arrests of Flores and defendant

On March 21, 2009, Detectives Toscano and Eaton interviewed Flores at his house. Flores said defendant borrowed his pickup truck, and he was not with defendant that night. Flores was not arrested.

On March 24, 2009, the detectives interviewed Flores at the sheriff's department. Flores admitted he was with defendant, but said defendant killed Smith, and Flores accidentally drove over his body. Flores was arrested that day.

Defendant was also arrested. Flores and defendant were charged with first degree murder, but Flores pleaded guilty to second degree murder and agreed to testify against defendant.

FLORES'S TRIAL TESTIMONY

At defendant's trial for first degree murder, Flores testified for the

prosecution and admitted he had pleaded guilty to the murder of Smith. He could have been sentenced to 56 years to life. Instead, he was sentenced to 36 years to life, and he had to testify truthfully against defendant. Flores had prior convictions for assault with a deadly weapon, assault with great bodily injury, and use of a weapon in 2005. He also had juvenile petitions for criminal threats, stealing a car, and statutory rape. Flores admitted he had been involved with a northern gang, Varrio Westside Madera, for almost his whole life. Flores had obtained firearms in the past to use against other people. He had been involved in some drive-by shootings, but insisted he had never shot anyone.

Flores testified he met defendant while they attended a residential drug rehabilitation program for two months in 2008. Flores was thrown out of the program when he was accused of threatening other clients. After they were out of the program, defendant and Flores hung out together and used drugs.

Flores met Smith through defendant. Smith sold drugs, and he did not have a steady home because of his own drug problem. Smith occasionally stayed at defendant's apartment.[fn4] About a month before Smith was killed, defendant obtained a .22-caliber rifle and told Flores he got it for his protection.

**FN4**: According to the probation report, defendant was 23 years old, and Smith was 19 years old.

The plan

Flores testified that on March 17, 2009, he spent the day with defendant. They went to Kerman to help a friend move. They used crystal methamphetamine at the friend's house.

Flores testified that defendant had a telephone conversation with Smith while they were in Kerman. After the call, defendant said he was tired of Smith "not paying his rent. Not paying his dues at the apartment. And he was tired of it and [Smith] had better pay up." When defendant made these statements, he was "tweaked out," "spinning," and "amped up on dope." Flores had seen defendant act like this "[a] lot of times." When defendant was like that, he would get "all antsy" and say that they needed to go commit a robbery.

Flores testified that while they were still in Kerman, they came up with a plan to lure Smith to a certain location, beat him up, and rob him. Earlier that week, Smith had given "bad dope" to both defendant and Flores, and had given some of defendant's drugs to Flores. Flores and defendant were upset with Smith because of the drug transaction. Defendant was also angry because Smith was not paying his share of the rent. Flores explained that Smith usually had money with him because he wrote false checks.

Flores testified that he agreed with defendant to "take [Smith] out, rob him, and just smash him and set him straight pretty much," and to "pretty much put [him] back on track ...." They planned to tell Smith that they were going to help someone move furniture. Defendant "was supposed to get out and smash him," and Flores agreed to be there "just pretty much if things got out of hand and [defendant] couldn't take care of

6

it ...." They agreed that defendant would beat up Smith because "it was [defendant's] rent money [Smith] was supposed to be paying," and the dispute was over defendant's drugs. The plan was for defendant to beat up Smith with his fists; they were not going to use any firearms. Defendant was supposed to take Smith's wallet and cash, and Flores would take his checkbook.

The drive to Kerman

On March 17, 2009, at some point between 8:30 p.m. and 9:00 p.m., defendant and Flores borrowed a blue pickup truck from Flores's stepfather. They went back to defendant's apartment. Smith arrived at the apartment later in the evening. Smith said he had used methamphetamine earlier in the day. Defendant and Flores followed their plan and told Smith they were going to drive to Kerman to move furniture for a friend. Defendant, Flores, and Smith got into the blue pickup truck.

Flores was driving, and defendant was in the front passenger seat. Smith sat in the back passenger seat. Defendant told Flores where to drive. Flores followed his instructions and headed toward Kerman. During the drive, defendant asked to borrow Smith's cell phone. Smith gave it to defendant, and defendant turned it off and kept it from him. Smith was "flipping out" and cussing at defendant to give back his cell phone. Defendant told Smith to chill out. They argued about the cell phone for quite awhile.

Flores testified he followed defendant's instructions and drove "forever." During the drive, Flores realized defendant had placed his rifle under the front seat. Flores believed that Smith could not see the weapon from the back seat. Flores testified it was not part of the plan to bring the rifle.

The homicide

At some point after midnight on March 18, 2009, defendant told Flores to pull over and park in a rural area where there were no lights or homes. Flores testified that he got out of the driver's door, and the only light was from inside the truck's cab. Flores smoked a cigarette and walked around the back of the truck. Defendant and Smith got out of their respective passenger doors. Defendant and Smith were still "bickering" about Smith's cell phone.

Flores testified he told Smith to "quit crying like a bitch" and punched him in the face. Smith took the punch and did not fall down. Flores turned around and intended to punch defendant because "he was bickering, too." Flores testified that these acts were not part of their plan, but he was angry and annoyed at them.

When Flores turned to punch defendant, however, he discovered defendant was holding up the rifle, and the barrel was pointed in Flores's direction. Flores became scared and ducked out of the way. Defendant shot Smith four or five times. Smith fell down after the first gunshot. Defendant bent over Smith and kept firing into his body.[fn5] Smith was screaming for help and repeatedly asked, "Why?"

**FN5**: As we will explain, post, it was alleged that defendant personally and

7

intentionally discharged a firearm causing death or great bodily injury. However, the jury found this allegation not to be true, indicating that it either did not believe, or was uncertain of, Flores's account that defendant fired the rifle at Smith.

After defendant fired the last shot, Smith remained on the ground and moaned in pain. Flores stood at the back of the truck. Flores testified he heard the rifle click and jam. Defendant started beating and "hacking" Smith's body with the back of the gun. Defendant swung the rifle like a baseball bat multiple times at Smith's head.

Flores stepped in and tried to stop defendant from continuing to hit Smith on the head. Flores testified he was wearing work boots that night. Flores believed his boot tracks were around Smith's body because he stood next to him when he tried to stop defendant from "hacking" Smith with the rifle. When he tried to stop defendant, however, Flores's hands were hit by the barrel as Smith continued to swing the rifle. Once defendant hit Flores's hand with the rifle, Flores backed away.

Flores testified that defendant hit Smith so many times that the rifle "broke into a bunch of pieces." When defendant finally stopped swinging the rifle, Smith did not make any more noise. Flores did not go through Smith's pockets and get the checkbook, as they planned, because "[t]hings got out of hand." Flores did not see Smith's possessions on the ground, and he did not see defendant go through his pockets, even though defendant was supposed to take Smith's money.

Flores and defendant got back in the truck, and Flores intended to drive away. Flores backed up the truck and realized he drove over Smith's body. Flores stopped, and then he drove forward and again ran over Smith's body. This was not part of the plan, but Flores admitted he was still angry. Flores drove away, and they left Smith on the side of the road.

The car wash

Flores drove to their friend's house in Kerman. They stayed there briefly, and then Flores drove to a car wash in Fresno to clean the mud and blood off his stepfather's pickup truck.[fn6] Defendant threw his clothes in the car wash's dumpster; Flores did not see what defendant did with his shoes. Flores threw his own clothes and shoes into the same dumpster.

**FN6**: The detectives reviewed security surveillance videotapes and observed a large vehicle, consistent with a pickup truck, at a car wash on Shaw and El Capitan in Fresno. It was at the car wash from 1:39 a.m. to 1:49 a.m. on March 18, 2009.

Flores drove back to defendant's apartment. Defendant gave Flores a black bag which contained a laptop computer. It had been in the backseat of the truck. Flores threw away the laptop.

Flores's initial statements

Flores testified that when the detectives initially interviewed him, he lied about the incident because he was scared. He told the detectives that defendant had borrowed the truck, and he was not with defendant that

night, so they would think defendant killed Smith by himself. Flores also told the officers that defendant was late when he returned with the truck, and there was mud all over the interior.

During the second interview, Flores told the detectives that he was with defendant that night, defendant killed Smith, and Flores accidentally "peeled out" and hit Smith with the truck's back tires. He did not tell the detectives about their plan to beat and rob Smith. Flores eventually told the detectives about their plan and how Smith was killed.

DEFENSE EVIDENCE

Pastor Douglas Erickson founded Maroa Home, a residential recovery program for male drug addicts which defendant and Flores attended. Richard Alvarado was a counselor at the program. Erickson and Alvarado testified they had regular contact with defendant while he was in the program. Defendant started in August 2007, graduated one year later, stayed after graduation, and took classes at a community college. Defendant successfully left the program in January 2009. Erickson described defendant as very mild, calm, and a peacemaker among the other residents. Alvarado thought he was well mannered and set a good example for other residents. He never acted out and always followed the program's rules. Defendant never failed any of the random drugs tests. Erickson was surprised by the murder charge against defendant and couldn't understand how he got involved in the incident. Alvarado would not have expected defendant to own a gun. Erickson and Alvarado had never seen defendant when he was on methamphetamine, and they never saw defendant outside the strict program environment.

Erickson and Alvarado testified that Flores was in the program for seven weeks. Erickson described Flores as volatile and angry. Flores was kicked out for writing very violent and threatening entries in his journal and threatening to beat up another resident. Alvarado believed Flores was a violent person. Alvarado never saw Flores and defendant hang out together and was surprised they knew each other.

Jane Sommer, defendant's aunt, described him as a peaceful person. She never saw him engage in any violent outbursts or altercations. She never saw him on methamphetamine and was surprised to hear he owned a shotgun. She last saw defendant during a family holiday in November 2008.

DEFENDANT'S TRIAL TESTIMONY

Defendant testified that he used crystal methamphetamine, and he had prior convictions for possession and transportation of methamphetamine for sale. Defendant explained that when he was on methamphetamine, he became paranoid, but he was never violent, and he had never been convicted of a violent crime.

Defendant testified he obtained the rifle about a month before Smith's death. Someone owed him money and gave him the rifle to pay the debt. He never used it against anyone. On cross-examination, however, defendant admitted he did not accept the rifle as a debt, but someone offered it to him and he accepted it. Defendant did not know who loaded the rifle with ammunition.

Defendant testified Smith lived with him when he did not have a place to live. Smith was current on his rent payments, they had a very good relationship, and there were no problems between them. Defendant met Flores at the treatment program. Flores's mood changed on a regular basis. Flores used crystal methamphetamine and drank. Defendant was scared of Flores because of his drug use, gang activities, and Flores's story about the things he had done for his gang. He never saw Flores act violently until the night of Smith's death.

Defendant considered Smith and Flores to be his friends. However, defendant heard "from both parties" that there were problems between them, but he did not know the reason. Defendant testified they never planned to rob or steal anything from Smith.

On cross-examination, defendant admitted he hung out with some of Flores's gang friends, even though he claimed to be afraid of them. Defendant claimed he was afraid of Flores when he was on drugs, but testified that he did drugs with Flores on the day of the murder and on other occasions.

Defendant testified he sold drugs after he left the drug treatment program. Defendant claimed he stopped selling drugs before Smith was killed, but people still called him to find out where they could buy drugs. He referred some of his former drug customers to Smith. Defendant admitted he told the detectives that he was upset because Smith sold "bad" drugs to some of defendant's former customers and "burned" them, and these people complained about it. Defendant admitted that Smith "burned" Flores in a drug deal that occurred one or two nights before the homicide. Defendant also admitted that it made him look bad for his roommate to burn people in drug transactions.

The decision to drive to Kerman

Defendant testified the incident began when Flores borrowed his family's truck so they could help Flores's friend move in Kerman. Defendant and Smith went with Flores. Defendant thought the drive to Kerman would give Smith and Flores the chance to talk about and resolve the dispute between them.

Defendant testified he took his rifle with him. He placed it in the toolbox on the driver's side in the back of the truck. He did not put the rifle in the cab. Defendant testified he had taken his rifle with him on many other trips with both Smith and Flores: "I was just trying to fit in. I'm not from around here. And I – the friends I had at the time were doing that sort of thing." Smith knew defendant brought the rifle and did not have a problem with it.

On cross-examination, defendant testified it was Flores's idea to bring the rifle with them that night. Defendant admitted he previously said that he took the gun so he could intimidate Smith. However, defendant said his prior statement was not truthful, and explained he did not take the gun "to intimidate anybody." Defendant testified he did not know who loaded the rifle, but admitted he told the detectives that Flores loaded it.

Defendant testified that Flores said "[h]e wanted us to check"

Smith. Defendant admitted that meant Flores wanted to "'f**k up'" Smith. However, defendant thought there wouldn't be any violence since he would be there. Defendant believed that Smith would not have gotten into the truck with Flores unless defendant had also been there, since Smith and Flores had problems between them. Defendant thought Flores would use the gun to intimidate Smith, and not to fire it.

<u>The argument in the truck</u>

Defendant testified that after they got into the truck, Flores stopped at a gas station to fill up the vehicle. While they were there, Flores borrowed Smith's cell phone even though Flores had his own cell phone. After the gas station, Flores headed to Kerman. Defendant was in the front passenger seat, and Smith was in the back.

Defendant testified that as Flores drove to Kerman, Flores and Smith talked about their dispute. Flores had done some mechanical work on Smith's vehicle, and Smith owed money to Flores "or had given him bad dope as payment, or something like that." Flores and Smith started to argue. Smith said he had better things to do and wanted to leave. Smith told Flores to stop so Smith could look for his cell phone and call someone to pick him up.

Defendant testified that while they argued, Flores put on latex gloves and then a pair of gardening gloves on top of them.

<u>The homicide</u>

Flores parked the truck on the side of the road. Defendant and Smith got out. Flores tossed Smith's cell phone across the front seat, and defendant handed it to Smith. Flores got out of the truck and grabbed defendant's rifle from the truck's toolbox. Flores stepped between defendant and Smith and shot Smith in the chest. Smith fell down, and Flores stood over him and shot him four more times.[fn7] Defendant was shocked, but he did not try to stop Flores because he had the rifle.

<u>FN7</u>: Defendant was impeached with his prior statement that Flores fired the first shot while standing on top of Smith. Defendant testified he was mistaken when he said that.

Defendant testified that after Flores stopped shooting, Flores held the rifle's barrel and repeatedly hit Smith's head with the rifle. Flores was swinging the rifle "straight down" like he was "chopping wood." Flores hit Smith 20 or 25 times, and did not say anything during the assault.

After Flores finished beating Smith, he told defendant to "get the f*** in the truck." They did not go through Smith's pockets or take anything from him. Defendant did not know why Smith's possessions were found around his body.

Defendant testified Flores put the truck in reverse and backed over Smith's head and chest. Defendant told Flores, "Dude, ... you just ran over David." Flores drove the truck forward and again went over Smith.

As Flores drove away from the scene, defendant said: "Holy f**k, you just killed David." Flores replied, "Dude, you better have my back.

You'll regret it if you don't have my back."

Defendant testified he was scared of Flores since he was a gang member and had just killed Smith. Defendant testified he did not call the police because he was under the influence of methamphetamine that night and he was not thinking straight.

The drive back to Fresno

Defendant testified that as Flores drove back to Fresno, he stopped at a fast food restaurant because Flores wanted something to eat. On further examination, defendant admitted they stopped because he was hungry, too.

"Q You got hungry after you saw your friend brutally murdered; is that accurate?

"A I knew that I had to go find something to eat, yes...."

After buying the food, Flores started driving again, and then stopped the truck and said he could not drive because there were blood spots on his glasses. Flores told defendant to drive the rest of the way, and defendant did so. They went to defendant's apartment and changed clothes. They drove to the car wash, threw away their clothes in the dumpster, washed the truck, and then returned the vehicle to Flores's parents. Defendant did not have any blood on his clothes, but he threw away his clothes because Flores told him to do so.

Defendant testified that Flores was initially angry that night, and then he became more nervous as they drove back to Fresno. Flores kept telling defendant that he better have his back.

Defendant testified that when he was initially interviewed by the detectives, he lied about everything. He was surprised they found him so quickly. He did not identify Flores, tell them what Flores did, or ask for protection from Flores. Defendant did not want to be a snitch, and he was afraid of what Flores might do to him. He also did not want to get in trouble because he helped Flores wash off the truck.

After he spoke to the officers, defendant called Macias for help and went to her residence. He was scared and on drugs when he was there. Defendant admitted he made the statements attributed to him by Macias and her boyfriend. He left Macias's apartment and went to another friend's residence, where he was arrested.

After he was arrested, defendant told the detectives that he did not know what happened. Defendant decided to give a statement after the detectives said that Flores claimed defendant killed Smith. However, defendant tried to minimize his role in the murder.

REBUTTAL

Detective Eaton testified the boot tracks at the homicide scene started on the driver's side of the truck, as the driver got out of the vehicle and walked to the front of the truck. The driver then walked to the passenger side of the truck, with the boot tracks going through the area of

1   the disturbance. The driver's boot tracks returned along the same path, as
2   he walked from the front of the truck and got back into the driver's side.
    These tracks were inconsistent with the driver walking to the truck's bed or
    the rear of the vehicle.

3       Christina Ceballos testified she dated Smith for a few months, and
4   she knew defendant and Smith were roommates. She saw defendant and
    Smith use methamphetamine at defendant's apartment. She also saw
5   Smith buy methamphetamine or crank from defendant. Defendant acted
    paranoid when he used drugs. Smith told Ceballos that defendant had a
6   gun. Ceballos asked Smith to move in with her because defendant was
    unstable and weird. Smith brushed it off and said he did not think
7   defendant would ever shoot him. Smith was killed about one week later.
    Ceballos was not surprised that defendant was arrested for killing Smith.

8   SURREBUTTAL

9       Rachel Savage testified she dated defendant for a few months, but
10  they were not together at the time of Smith's death. Savage had never
    seen defendant act aggressively or violently when he was under the
11  influence. Instead, defendant acted the same as when he was sober.
    Savage never saw any problems between defendant and Smith; they were
12  very friendly to each other; they never argued; and she was surprised
    when defendant was arrested for the murder. Savage still cared about
13  defendant and did not want anything bad to happen to him.

14  VERDICT AND SENTENCE

15      Defendant was tried for first degree murder, and the jury was
    instructed on second degree murder as the only lesser included offense.
16  The jury convicted defendant of second degree murder and found true the
    special allegation that a principal was armed with a firearm in the
17  commission of the offense (§ 12022, subd. (a)(1)). However, the jury
    found not true the allegation that defendant personally and intentionally
18  discharged a firearm which caused death (§ 12022.53, subd. (d)). The jury
    thus concluded that defendant was not the gunman, but he was guilty of
19  second degree murder as an aider and abettor.

20  People v. Bowman, 2013 Cal. App. Unpub. LEXIS 7559, 1-28 (2013).

21  **III.   Discussion**

22      **A.   Jurisdiction**

23      Relief by way of a petition for writ of habeas corpus extends to a person in

24  custody pursuant to the judgment of a state court if the custody is in violation of the

25  Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

26  2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

27  suffered violations of his rights as guaranteed by the U.S. Constitution.   (Pet.)   In

28  addition, the conviction challenged arises out of the Fresno County Superior Court,

13

1  which is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a).

2  Accordingly, this Court has jurisdiction over the instant action.

3  **B.    Legal Standard of Review**

4  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

5  Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

6  filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

7  114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment

8  of the AEDPA and is therefore governed by AEDPA provisions.

9  Under AEDPA, a person in custody under a judgment of a state court may only be

10  granted a writ of habeas corpus for violations of the Constitution or laws of the United

11  States.  28 U.S.C. § 2254(a); Williams, 529 U.S. at 375 n. 7.  Federal habeas corpus

12  relief is available for any claim decided on the merits in state court proceedings if the

13  state court's adjudication of the claim:

14
15  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

16
17  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

18  28 U.S.C. § 2254(d).

19  **1.    Contrary to or an Unreasonable Application of Federal Law**

20  A state court decision is "contrary to" federal law if it "applies a rule that

21  contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

22  that [are] materially indistinguishable from [a Supreme Court case] but reaches a

23  different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at

24  405-06).  "AEDPA does not require state and federal courts to wait for some nearly

25  identical factual pattern before a legal rule must be applied . . . The statute recognizes . .

26  . that even a general standard may be applied in an unreasonable manner." Panetti v.

27  Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

28  "clearly established Federal law" requirement "does not demand more than a 'principle'

1    or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state

2    decision to be an unreasonable application of clearly established federal law under §

3    2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

4    (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-

5    71 (2003).  A state court decision will involve an "unreasonable application of" federal

6    law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at

7    409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).  In Harrington v. Richter, the

8    Court further stresses that "an *unreasonable* application of federal law is different from

9    an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011) (citing Williams, 529

10   U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks

11   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

12   correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541

13   U.S. 653, 664 (2004)).  Further, "[t]he more general the rule, the more leeway courts

14   have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S.

15   Ct. 1855, 1864 (2010).   "It is not an unreasonable application of clearly established

16   Federal law for a state court to decline to apply a specific legal rule that has not been

17   squarely established by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

18   (2009) (quoted by Richter, 131 S. Ct. at 786).

19                      **2.    Review of State Decisions**

20        "Where there has been one reasoned state judgment rejecting a federal claim,

21   later unexplained orders upholding that judgment or rejecting the claim rest on the same

22   grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

23   "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

24   (9th Cir. 2006).   Determining whether a state court's decision resulted from an

25   unreasonable legal or factual conclusion, "does not require that there be an opinion from

26   the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85.

27   "Where a state court's decision is unaccompanied by an explanation, the habeas

28   petitioner's burden still must be met by showing there was no reasonable basis for the

1   state court to deny relief." Id. "This Court now holds and reconfirms that § 2254(d) does

2   not require a state court to give reasons before its decision can be deemed to have been

3   'adjudicated on the merits.'" Id.

4       Richter instructs that whether the state court decision is reasoned and explained,

5   or merely a summary denial, the approach to evaluating unreasonableness under §

6   2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

7   or theories supported or, as here, could have supported, the state court's decision; then

8   it must ask whether it is possible fairminded jurists could disagree that those arguments

9   or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

10  Thus, "even a strong case for relief does not mean the state court's contrary conclusion

11  was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

12  authority to issue the writ in cases where there is *no possibility* fairminded jurists could

13  disagree that the state court's decision conflicts with this Court's precedents." Id.

14  (emphasis added).  To put it yet another way:

15          As a condition for obtaining habeas corpus relief from a federal
     court, a state prisoner must show that the state court's ruling on the claim
16   being presented in federal court was so lacking in justification that there
     was an error well understood and comprehended in existing law beyond
17   any possibility for fairminded disagreement.

18  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

19  are the principal forum for asserting constitutional challenges to state convictions." Id. at

20  787.  It follows from this consideration that § 2254(d) "complements the exhaustion

21  requirement and the doctrine of procedural bar to ensure that state proceedings are the

22  central process, not just a preliminary step for later federal habeas proceedings." Id.

23  (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

24        **3.     Prejudicial Impact of Constitutional Error**

25      The prejudicial impact of any constitutional error is assessed by asking whether

26  the error had "a substantial and injurious effect or influence in determining the jury's

27  verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

28  U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).

## IV.   Review of Petition

### A.   Claim One – Failure to Instruct on Voluntary Intoxication

Petitioner contends the trial court violated his constitutional rights by failing to instruct the jury regarding voluntary intoxication.

### 1.   State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 11-16.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05, 111 S. Ct. 2590, 115 L. Ed. 2d 706 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

I. Voluntary Intoxication

Defendant contends the court committed prejudicial error when it declined his request to instruct the jury with CALCRIM No. 404 on intoxication. Defendant asserts the entirety of the record contains substantial evidence that he used methamphetamine on the day of the murder, and that evidence would have supported the instruction.

A. Background

17

Defendant was tried for first degree murder, and the court instructed the jury on second degree murder as a lesser included offense. As to both theories of murder, the jury was instructed on express and implied malice, and natural and probable consequences (CALCRIM No. 520). The jury was instructed on first degree felony murder based on robbery or attempted robbery; it was not instructed on second degree felony murder. (CALCRIM Nos. 540A, 540B.) The jury was further instructed as to premeditation, willfulness, and deliberation for first degree murder. (CALCRIM No. 521.) The jury was also instructed that defendant could be guilty either as a principal or aider and abettor. (CALCRIM Nos. 400, 401.)

The court denied defendant's request to give the following instruction on intoxication, CALCRIM No. 404:

"If you conclude that the defendant was intoxicated at the time of the alleged crime, you may consider this evidence in deciding whether the defendant:

"A. Knew that <insert name of perpetrator> intended to commit <insert target offense>; [¶] AND

"B. Intended to aid and abet <insert name of perpetrator> in committing <insert target offense>.

"Someone is intoxicated if he or she (took[,]/ [or] used[,]/[or] was given) any drug, drink, or other substance that caused an intoxicating effect.

"[Do not consider evidence of intoxication in deciding whether <insert charged nontarget offense> is a natural and probable consequence of <insert target offense>.]"

The court also denied defendant's request to give instructions on the lesser included offenses of voluntary manslaughter, based on both heat of passion and imperfect self defense (CALCRIM Nos. 570, 571); involuntary manslaughter (CALCRIM No. 580); assault with a deadly weapon or force likely to produce great bodily injury (CALCRIM No. 875); simple assault (CALCRIM No. 915); battery (CALCRIM Nos. 925, 926); and shooting a firearm in a grossly negligent manner (CALCRIM No. 970). The court stated there was insufficient evidence to support giving any of the requested instructions on lesser offenses and intoxication.

B. Voluntary Intoxication

Evidence of a defendant's voluntary intoxication is not an affirmative defense to a crime. (§ 29.4, subd. (a); People v. Martin (2000) 78 Cal.App.4th 1107, 1116-1117; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 26, pp. 355-356.)[fn8] In addition, evidence of a defendant's voluntary intoxication is inadmissible to negate the existence of a general criminal intent for a charged offense. (People v. Atkins (2001) 25 Cal.4th 76, 81.)

**FN8**: Effective January 1, 2013, section 22, which previously addressed voluntary intoxication, was renumbered as section 29.4 without substantial

changes. (Stats. 2012, ch. 162, § 119; see § 29.4, Historical and Statutory Notes, 2012 Legislation.)

As to a specific intent crime, however, evidence of a defendant's voluntary intoxication may be admissible on the issue of whether the defendant actually formed the required specific intent to commit the charged offense. (§ 29.4, subd. (b); People v. Atkins, supra, 25 Cal.4th at p. 81; People v. Carr (2000) 81 Cal.App.4th 837, 843; People v. Pensinger (1991) 52 Cal.3d 1210, 1242-1243.)

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, *when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought*." (§ 29.4, subd. (b), italics added.)

The defendant may also present evidence of voluntary intoxication on the question of whether he or she is culpable of an offense as an aider and abettor. (People v. Mendoza (1998) 18 Cal.4th 1114, 1129-1130, 11133-1134.) "[T]he intent requirement for aiding and abetting liability is a 'required specific intent' for which evidence of voluntary intoxication is admissible under [former] section 22...." (Id. at p. 1131.)

C. The court's duty to instruct

An instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant. (People v. Verdugo (2010) 50 Cal.4th 263, 295.) Even when requested, however, the defendant "is entitled to such an instruction only *when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent*.' [Citations.]" (People v. Williams (1997) 16 Cal.4th 635, 677, italics added; People v. Verdugo, supra, 50 Cal.4th at p. 295.) Thus, substantial evidence of intoxication alone is not enough; there must also be evidence that the intoxication impaired the defendant's ability to formulate intent. (People v. Williams, supra, 16 Cal.4th 35, 677-678.) For example, "[t]he mere fact that defendant may have been drinking prior to the commission of the crime does not establish intoxication ...." (People v. Miller (1962) 57 Cal.2d 821, 830-831.) There must be substantial evidence the defendant was unaware of what he or she was doing as a result of intoxication. (People v. Carpenter (1997) 15 Cal.4th 312, 395, superceded by statute on another ground as noted in Verdin v. Superior Court (2008) 43 Cal.4th 1096, 1106.)

In this context, substantial evidence to support a defense instruction is "evidence sufficient to 'deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.'" (People v. Williams (1992) 4 Cal.4th 354, 361, italics in original; People v. Lewis (2001) 26 Cal.4th 334, 369.) "'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt ...." [Citations.]' [Citation.] '""The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon."'" [Citation.] As an obvious corollary, if the

evidence is minimal and insubstantial the court need not instruct on its effects.' [Citation.]" (<u>People v. Larsen</u> (2012) 205 Cal.App.4th 810, 823-824.) The court is not obliged to instruct on theories that have no evidentiary support. (<u>Id.</u> at p. 824.)

D.   <u>Analysis</u>

The court properly declined defendant's request to instruct the jury on voluntary intoxication because of the lack of substantial evidence to support the instruction. The entirety of the record demonstrates that while defendant may have used methamphetamine several hours before the murder, there is no evidence that he was intoxicated to such a level that it affected his actual formation of specific intent.

Flores testified he used crystal methamphetamine with defendant earlier on the day of March 17, 2009, when they were in Kerman and helping their friend move. Flores did not offer any details on how much methamphetamine they used at that time. He described defendant's anger after his phone call with Smith, and how defendant was "tweaked out," "spinning," and "amped up on dope." Flores further testified that while they were still in Kerman, they came up with a plan to lure Smith to a certain location, beat him up, and rob him. Even though Flores described defendant as being "amped up on dope," he also testified about defendant's agreement and participation in a very specific plan to get Smith into the vehicle, take him to a remote location, and beat and rob him.

As to the actual homicide, however, Flores further testified that they did not begin to carry out their plan until later that night. Flores and defendant borrowed the truck from Flores's family, they returned to defendant's apartment in Fresno, and they waited for Smith to arrive. There was no testimony that defendant continued to use methamphetamine while they waited for Smith, that defendant still displayed amped up behavior, or that he used drugs after Smith arrived at the apartment or before they left in the truck.

Both Flores and defendant testified it was dark and presumably after midnight when Flores stopped the car in a rural area and Smith was killed. Both Flores and defendant testified they went to the car wash after the murder. The surveillance videotape at the carwash established that defendant and Flores were there at 1:39 a.m., further indicating that several hours had passed since their joint use of an unknown amount of methamphetamine earlier the previous day.

More importantly, neither Flores nor defendant offered any testimony to provide substantial evidence that defendant used methamphetamine or any other drug to such an extent that it affected his actual formation of specific intent. To the contrary, Flores described defendant's calculated and intentional conduct, that defendant lured Smith into the truck, smuggled his rifle into the vehicle without Smith or Flores seeing it, took away Smith's cell phone, and murdered Smith.

Defendant's own trial testimony did not fill the evidentiary gaps for the intoxication instruction. Defendant blamed Flores for the plan to "check" Smith, and testified that Flores fired the fatal shots and bludgeoned Smith with the rifle. However, defendant did not testify about

1
2
3

his alleged use of methamphetamine that day, except to explain that he never called the police after the murder for two reasons: (1) he was scared of Flores since he was a gang member and had just killed Smith, and (2) he was under the influence of methamphetamine that night and was not thinking straight.

4
5
6
7
8
9

Defendant never testified as to when he used drugs or how much he ingested. He did not testify that his drug use affected his ability to understand what he was planning to do with Flores or what he actually did that night to help Flores. To the contrary, defendant gave very specific testimony about his conversations with Flores prior to the murder, the interactions with Flores and Smith in the truck, how he knew Smith would not have entered the vehicle if he had not been present, and his admission about bringing his rifle. Defendant tried to claim that he just thought that Smith and Flores were going to talk about their dispute, but he was extensively impeached with his prior statements about why he brought his rifle, and that they were going to "'f**k up'" Smith.

10
11
12

The trial court thus properly denied defendant's request for a voluntary intoxication instruction. Even though there might have been some evidence that defendant used methamphetamine several hours before the murder, "there was no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent." (People v. Williams, supra, 16 Cal.4th at p. 677-678.)

13   People v. Bowman, 2013 Cal. App. Unpub. LEXIS 7559 at 28-37.

14   **3.     Analysis**

15   This Court's review of Petitioner's claim of state instructional error is "limited to

16   deciding whether [his] conviction violated the Constitution, laws, or treaties of the United

17   States." Estelle v. McGuire, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991);

18   28 U.S.C. § 2241. In order to grant federal habeas relief on the basis of faulty jury

19   instructions, the Court must first conclude that the alleged error was of constitutional

20   magnitude. See California v. Roy, 519 U.S. 2, 117 S. Ct. 337, 136 L. Ed. 2d 266 (1996).

21   In order to grant federal habeas relief on the basis of faulty jury instructions, the

22   Court must conclude that the alleged error "had substantial and injurious effect or

23   influence in determining the jury's verdict." Roy, 519 U.S. at 5; Brecht, 507 U.S. at 637.

24   Federal habeas relief is warranted only if the Court, after reviewing the record, has

25   "grave doubt" as to the error's effect. Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir.

26   1998). "The burden of demonstrating that an erroneous instruction was so prejudicial

27   that it will support a collateral attack on the constitutional validity of a state court's

28   judgment is even greater than the showing required to establish plain error on direct

1   appeal." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203

2   (1977). The trial court's error in omitting a jury instruction is less likely to be prejudicial

3   than the trial court's misstatement of the law. <u>Henderson</u>, 431 U.S. at 155; <u>see also</u>

4   <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th Cir. 1997) (habeas petitioner whose claim

5   involves a failure to give a particular instruction bears an especially heavy burden).

6      To evaluate the effect of jury instructions, the Court must look at the context of the

7   entire trial and overall charge to the jury. <u>Estelle</u>, 502 U.S. at 72; <u>Prantil v. California</u>, 843

8   F.2d 314, 317 (9th Cir. 1988). They may not be judged in artificial isolation. <u>Estelle</u>, 502

9   U.S. at 72. In addition, a reviewing court's principal constitutional inquiry is whether there

10  is a reasonable likelihood that the jury applied the challenged instructions in a way that

11  violates the Constitution. <u>See</u> <u>id.</u>

12     While a state is generally free to define the elements of an offense, once the state

13  has defined the elements, due process requires that the jury be instructed on each

14  element and instructed that they must find each element beyond a reasonable doubt.

15  <u>Francis v. Franklin</u>, 471 U.S. 307, 313, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985); <u>In re</u>

16  <u>Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); <u>United States v.</u>

17  <u>Perez</u>, 116 F.3d 840, 847 (9th Cir. 1997); <u>Stanton</u>, 146 F.3d at 728.

18     It necessarily follows, therefore, that constitutional trial error occurs when a jury

19  makes a guilty determination on a charged offense without a finding as to each element

20  of the offense. According to the Supreme Court, a jury instruction that omits an element

21  of the offense constitutes such an error. <u>Neder v. United States</u>, 527 U.S. 1, 8, 119 S. Ct.

22  1827, 144 L. Ed. 2d 35 (1999). However, such an error "does not necessarily render a

23  criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or

24  innocence." <u>Id.</u> at 9. Provided that such an error occurred, Petitioner's conviction can

25  only be set aside if the error was not harmless under <u>Chapman v. California</u>, 386 U.S.

26  18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); <u>Neder</u>, 527 U.S. at 15. Under the <u>Chapman</u>

27  harmless error test, it must be determined "beyond a reasonable doubt" whether "the

28  error complained of did not contribute to the verdict obtained." <u>Chapman</u>, 386 U.S. at 24.

1    Here, Petitioner contends the trial court erred in instructing the jury by not

2  providing the jury with an instruction on involuntary intoxication as a basis for showing

3  that Petitioner did form the intent to commit murder or aid and abet in the murder. The

4  jury returned a guilty verdict based on aider and abettor liability as to second degree

5  murder. The instruction was only required if there was a reasonable basis for the jury to

6  find that Petitioner lacked knowledge that Flores intended to kill the victim and that

7  Petitioner did not intend to aid and abet in the murder based on the in toxifying effect of

8  his methamphetamine use.

9    As described in the state court decision, there was testimony that Petitioner had

10  used methamphetamine earlier in the day, but there was no testimony that he was so

11  impaired by his use at the time of the offense that he was unaware of what was

12  occurring and lacked the specific intent to aid and abet in the murder. After Flores

13  borrowed his stepfather's truck on the evening of the murder, there was evidence that

14  Petitioner assisted in hiding his rifle in vehicle. Petitioner was present during the drive to

15  a rural location where the murder occurred. Even if he did not commit the physical act of

16  the murder, he helped Flores wash the truck, and disposed of his clothes in an attempt

17  to cover-up the crime. He later made incriminating statements to friends.

18    While there was evidence that Petitioner had used methamphetamine earlier in

19  the day, he did not argue that the effect of the drug caused him not to comprehend the

20  actions that he and Flores were taking. During closing argument, defense counsel

21  repeatedly mentioned that Petitioner dealt and used methamphetamine, but not to argue

22  he was unaware that he was aiding and abetting in the murder. Instead, defense counsel

23  was arguing that Flores had a long violent criminal history whereas Petitioner had no

24  criminal history of violent crime,  just convictions for methamphetamine related crimes.

25  (Rep. Tr. at 1097-98, 1106, 1109.) Defense counsel argued that Petitioner brought the

26  gun, based on his paranoia induced by methamphetamine that someone was out to get

27  him. (Id. at 1109.) However, even if true, there was significant additional evidence of

28  Petitioner's involvement, particularly after the murder was committed. Upon review, the

23

state court's holing was a reasonable application of federal law. Based on the evidence presented, Petitioner has not shown that the court erred in failing to provide the jury instruction. Even had an instructional error occurred, Petitioner has not shown it had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.

Accordingly, the Court finds that the trial court did not commit instructional error such that resulted in the violation of Petitioner's due process. <u>See</u> <u>Estelle</u>, 502 U.S. at 72. Petitioner's first claim for relief is denied.

## B. Claim Two – Failure to Instruct on Involuntary Manslaughter

Petitioner contends the trial court violated his constitutional rights by failing to instruct the jury regarding involuntary manslaughter as a lesser included defense of murder.

### 1. State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (<u>See</u> Lodged Docs. 11-16.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. <u>See</u> <u>Ylst</u>, 501 U.S. at 804-05.

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

II. <u>The court properly denied defendant's request to instruct on involuntary manslaughter</u>

As explained in section IA, *ante*, defendant also requested the court to instruct the jury on involuntary manslaughter as a lesser included offense of murder. The court denied the request and found insufficient evidence to support the instruction. Defendant contends the court committed error and the instruction should have been given.

A. The court's *sua sponte* duty to instruct

"[A] trial court errs if it fails to instruct, *sua sponte*, on all theories of a lesser included offense which find substantial support in the evidence.

On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support...." (<u>People v. Breverman</u> (1998) 19 Cal.4th 142, 162.)

As with the request for a defense instruction, "the existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could ... conclude[]"' that the lesser offense, but not the greater, was committed. [Citations.]" (<u>People v. Breverman</u>, *supra*, 19 Cal.4th at p. 162.) However, if the evidence supporting the lesser included offense is "minimal and insubstantial the court need not instruct on its effect. [Citations.]" (<u>People v. Glenn</u> (1991) 229 Cal.App.3d 1461, 1465, overruled on other grounds in <u>People v. Blakeley</u> (2000) 23 Cal.4th 82, 91.)

The failure to instruct *sua sponte* on a lesser included offense in a noncapital case is not subject to reversal unless an examination of the entire record establishes a reasonable probability the error affected the outcome. (<u>People v. Breverman</u>, *supra*, 19 Cal.4th at p. 165; <u>People v. Watson</u> (1956) 46 Cal.2d 818, 836.)

B. <u>Involuntary manslaughter</u>

Involuntary manslaughter is a lesser included offense of murder. (<u>People v. Thomas</u> (2012) 53 Cal.4th 771, 813.) "'Manslaughter is the unlawful killing of a human being without malice.' [Citation.] Involuntary manslaughter is manslaughter during 'the commission of an unlawful act, not amounting to a felony,' or during 'the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' [Citation.] 'The offense of involuntary manslaughter requires proof that a human being was killed and that the killing was unlawful. [Citation.] A killing is "unlawful" if it occurs (1) during the commission of a misdemeanor inherently dangerous to human life, or (2) in the commission of an act ordinarily lawful but which involves a high risk of death or bodily harm, and which is done "without due caution or circumspection."' [Citation.]" (<u>People v. Murray</u> (2008) 167 Cal.App.4th 1133, 1140.) There also exists a nonstatutory form of the offense, which is based on the predicate act of a noninherently dangerous felony committed without due caution and circumspection. (<u>People v. Butler</u> (2010) 187 Cal.App.4th 998, 1007.) "[C]riminal negligence is the governing mens rea standard for all three forms of committing the offense. [Citations.]" (<u>Ibid.</u>)

C. <u>Analysis</u>

Defendant asserts the court should have given the involuntary manslaughter instruction for two reasons: (1) there was evidence he only intended to assault Smith, or aid and abet Flores's commission of a misdemeanor assault or battery against Smith; and (2) there was evidence he only intended to brandish a weapon against Smith, or aid and abet Flores in brandishing a weapon.

Despite defendant's arguments on this topic, the court was not obliged to instruct on involuntary manslaughter as a lesser included

offense to murder. While Flores and defendant blamed each other for firing the fatal shots and bludgeoning Smith, their accounts were remarkably similar as to exactly how Smith was killed: there was a dispute between Smith, Flores, and defendant about drugs; defendant and Flores intended to settle matters; defendant was instrumental in obtaining Smith's agreement to get into the truck with Flores; one of them took Smith's cell phone to prevent him from calling for help; defendant brought his loaded rifle and hid it under the truck's seat; the perpetrator initially shot Smith in the chest, and then fired three or four more shots into his body; the perpetrator repeatedly swung the rifle at Smith's head and body with such force that the weapon broke into pieces; and Flores drove the truck backward and forward over Smith's body as he left the scene.

The lesser included offense of manslaughter does not include the element of malice, which distinguishes it from the greater offense of murder. (People v. Rios (2000) 23 Cal.4th 450, 460.) Moreover, involuntary manslaughter is inherently an unintentional killing. (People v. Hendricks (1988) 44 Cal.3d 635, 643.) In this case, the manner in which Smith was killed, together with defendant's own statements and admissions, established malice and the intent to kill. There was no evidence defendant aided and abetted the commission of a misdemeanor or a criminally negligent act. At trial, defendant initially claimed he always took his rifle with him when he went on drives; he thought the drive to Kerman would give Smith and Flores a chance to discuss their dispute; and he believed he could mediate their dispute. After extensive cross-examination, defendant admitted he had a plan with Flores to get Smith into the truck with them. He knew Flores was upset about a drug deal with Smith, and Smith would not have entered the truck unless defendant was there. Flores wanted to "check" Smith because of their dispute. Defendant intentionally put his rifle into the truck to help Flores "check" Smith, and he knew that Flores wanted to "f*** up" Smith. Defendant did not express any surprise that they were going to "check" Smith in a rural and remote area in the middle of the night, instead of confronting Smith in defendant's apartment. Defendant's conduct after the murder was also inconsistent with his claim that he was surprised or frightened by Flores's conduct: he helped Flores wash the truck; he changed and disposed of his clothes; and he was hungry and wanted to eat something after his supposed friend had been brutally killed. Defendant's statements to Macias and her boyfriend also refute his manslaughter arguments, given his statements that he was in the "worst possible trouble," "it wasn't an accident," and he was "doomed."

The vicious manner in which Smith was fatally shot and beaten refutes any claim that he was killed during the commission of a misdemeanor or as a result of criminal negligence, and the court was not obliged to instruct on involuntary manslaughter as a lesser included offense of murder.

People v. Bowman, 2013 Cal. App. Unpub. LEXIS 7559 at 31-42.

### 2.     Analysis

To the extent Petitioner alleges the instructional claim violated state law, Petitioner's claim is not cognizable in this proceeding. The Supreme Court has held that

1  a challenge to a jury instruction solely as an error under state law does not state a claim

2  cognizable in federal habeas corpus proceedings. Estelle v. McGuire, 502 U.S. at 71-72.

3  Section 2254 requires violation of the Constitution, laws, or treaties of the United States.

4  28 U.S.C. §§ 2254(a), 2241(c)(3). To the extent that Petitioner raises state law claims,

5  his claims should be dismissed.

6        Although the Supreme Court has held that the failure to instruct on lesser included

7  offenses can constitute constitutional error in capital cases, Beck v. Alabama, 447 U.S.

8  625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), it has reserved decision on whether such

9  an omission in non-capital cases constitutes constitutional error, id. at 638 n.7. When the

10  Supreme Court has expressly reserved consideration of an issue, there is no Supreme

11  Court precedent creating clearly established federal law relating to a petitioner's habeas

12  claim. Alberni v. McDaniel, 458 F.3d 860, 864 (9th Cir. 2006). Therefore, a petitioner

13  cannot rely on circuit authority, and there is no basis for relief pursuant to § 2254(d)(1)

14  for an unreasonable application of clearly established federal law. Alberni v. McDaniel,

15  458 F.3d at 864; Brewer v. Hall, 378 F.3d 952, 955-57 (9th Cir. 2004).

16        Accordingly, there is no clearly established federal law within the meaning of §

17  2254(d) concerning a state court's rejection of a claim that Sixth and Fourteenth

18  Amendment rights in a non-capital case were violated by a failure to instruct on a lesser

19  included offense. Thus, such a claim is not cognizable in a proceeding pursuant to 28

20  U.S.C. § 2254 and is subject to dismissal. Windham v. Merkle, 163 F.3d 1092, 1105-06

21  (9th Cir. 1998).

22        The absence of the instruction did not result in any fundamental unfairness. The

23  only other basis for federal collateral relief for instructional error is that an infirm

24  instruction or the lack of instruction by itself so infected the entire trial that the resulting

25  conviction violates due process. Estelle v. McGuire, 502 U.S. at 71-72. This standard

26  was set forth previously in claim one, supra.

27        Petitioner contends that the trial court should have *sua sponte* instructed the jury

28  with regard to voluntary manslaughter. The state court was reasonable in determining

that there was insufficient evidence supporting the instruction. Petitioner argues that the instruction was proper as there was evidence that he only intended to assault the victim or brandish a weapon against the victim, or aid Flores in the acts of assault or brandishing a weapon. However, the state court found that the facts surrounding the crime indicated the "vicious manner" in which the victim was shot and beaten and refute Petitioner's claim that the victim was killed in the commission of a misdemeanor or by way of criminal negligence. People v. Bowman, 2013 Cal. App. Unpub. LEXIS 7559 at 31-42. Petitioner and Flores devised a plan to take the victim to a rural location, and took his cell phone to prevent him from calling for help. They then shot him multiple times, beat the victim with the rifle until it broke, and ran over the victim. Afterwards, Petitioner and Flores ate, washed the truck, and threw away their clothes. Based on the facts presented at trial, it was reasonable for the trial court judge to determine that the involuntary manslaughter instruction was not applicable.

The finding of the state court on appeal was reasonable and Petitioner has not shown that he suffered any fundamental unfairness or that the omission had any substantial or injurious effect or influence in determining the jury's verdict. Accordingly, Petitioner's claim concerning the failure to instruct on the lesser included offense of voluntary manslaughter is denied.

### C.   Claim Three – Imposition of Restitution Fine

Petitioner contends the trial court violated his constitutional right to a jury trial by the court's imposition of a restitution fine.

### 1.   State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 11-16.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have

1    issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

2         In denying Petitioner's claim, the Fifth District Court of Appeal explained:

3    III. The court's restitution orders

4         At the sentencing hearing, the court imposed a $10,000 restitution
5    fine (§ 1202.4, subd. (b)), and imposed and stayed another $10,000
     restitution fine pending successful completion of parole (§ 1202.45). The
6    court also ordered defendant to pay victim restitution of $6,451.69, as
     recommended by the probation report, based on a claim by the victim's
7    family for funeral expenses (§ 1202.4, subd. (f)). Defendant did not object
     to the probation report's recommendations or the court's orders.

8         Defendant now contends that he had a right to a jury trial on
9    whether he could be ordered to pay victim restitution, and his ability to pay
     the restitution fine. In making both arguments, defendant relies on the
10   United States Supreme Court's decisions in Apprendi v. New Jersey
     (2000) 530 U.S. 466 (Apprendi) and Southern Union Co. v. United States
11   (2012) 567 U.S. [132 S.Ct. 2344] (Southern Union). As we will explain, his
     reliance on these cases is misplaced.

12   A. Apprendi, Blakely, and Southern Union

13        In Apprendi, the court held that "[o]ther than the fact of a prior
14   conviction, any fact that increases the penalty for a crime beyond the
     prescribed statutory maximum must be submitted to a jury and proved
15   beyond a reasonable doubt." (Apprendi, supra, 530 U.S. at p. 490.) As the
     court explained in Blakely v. Washington (2004) 542 U.S. 296 (Blakely),
16   "[The] 'statutory maximum' for Apprendi purposes is the maximum
     sentence a judge may impose solely on the basis of the facts reflected in
17   the jury verdict or admitted by the defendant." (Id. at p. 303, italics
     omitted.) Stated differently, "[T]he relevant 'statutory maximum' is not the
18   maximum sentence a judge may impose after finding additional facts, but
     the maximum he may impose *without* any additional findings." (Id. at pp.
19   303-304.) Therefore, in sentencing a defendant, a judgment may not
     "inflic[t] punishment that the jury's verdict alone does not allow." (Id. at p.
20   304.)

21        In Southern Union, the court held the Apprendi rule applied equally
     to the imposition of criminal fines. (Southern Union, supra, 132 S.Ct. at p.
22   2357.) In that case, a jury convicted the defendant corporation of
     knowingly storing hazardous waste without a permit in violation of federal
23   law. The criminal violations were punishable by a fine of up to $50,000 for
     each day the defendant violated the law. However, the jury did not make
24   specific factual findings as to the number of days the corporation violated
     the law. The trial court imposed an aggregate fine of $38.1 million, and
25   determined from the "'content and context of the verdict all together' that
     the jury found a 762-day violation" (id. at p. 2346) of the law, at $50,000
26   per day. Southern Union held the trial court's factual finding as to the
     number of days the defendant committed the crime violated Apprendi and
27   the defendant's Sixth Amendment right to a jury determination, because
     the criminal fines were a form of punishment. (Southern Union Co., *supra*,
     132 S.Ct. at pp. 2350-2352.)

28

29

B. <u>Federal circuit cases</u>

Defendant asserts that Southern Union's interpretation of <u>Apprendi</u> now mandates jury trials for the imposition of both restitution fines and victim restitution orders. However, federal courts have held that <u>Apprendi</u> does not apply to restitution orders. (<u>U.S. v. Day</u> (4th Cir. 2012) 700 F.3d 713, 732; U.S. v. Wolfe (7th Cir. 2012) 701 F.3d 1206, 1217; <u>U.S. v. Wooten</u> (10th Cir. 2004) 377 F.3d 1134, 1144, fn. 1.) The Ninth Circuit has "'categorically held that <u>Apprendi</u> and its progeny ... don't apply to restitution." (<u>U.S. v. Green</u> (9th Cir. 2013) 722 F.3d 1146, 1149; <u>U.S. v. Bussell</u> (9th Cir. 2005) 414 F.3d 1048, 1060; <u>U.S. v. DeGeorge</u> (9th Cir. 2004) 380 F.3d 1203, 1221; <u>U.S. v. Gordon</u> (9th Cir. 2004) 393 F.3d 1044, 1051, fn. 2.)

The Ninth Circuit recently held that <u>Southern Union</u> has not changed this analysis: "Even if [<u>Southern Union</u>] chips away at the theory behind our restitution cases, it's not 'clearly irreconcilable' with our holdings that restitution is 'unaffected' by <u>Apprendi</u>," because "Southern Union deals with criminal fines, not restitution. It's far from 'clear[]' ... that a rule governing one would govern the other." (<u>U.S. v. Green</u>, supra, 722 F.3d at p. 1150.)

C. <u>Kramis and Pangan</u>

The California Courts of Appeal have also concluded that Southern Union does not require jury trials for either restitution fines or victim restitution orders. In <u>People v. Kramis</u> (2012) 209 Cal.App.4th 346 (<u>Kramis</u>), the Second District, Division 5 held that the defendant was not entitled to a jury trial on the determination and imposition of a $10,000 restitution fine imposed pursuant to section 1202.4, subdivision (b). (<u>Kramis</u>, supra, 209 Cal.App.4th at pp. 349-351.) "<u>Apprendi</u> and <u>Southern Union Co.</u> do not apply when, as here, the trial court exercises its discretion within a statutory range. [Citations.]" (<u>Id.</u> at p. 351.) In reaching this conclusion, <u>Kramis</u> favorably relied on this court's decision in <u>People v. Urbano</u> (2005) 128 Cal.App.4th 396, an opinion which predated Southern Union but addressed <u>Apprendi's</u> potential application to restitution orders:

"As the Court of Appeal for the Fifth Appellate District noted in <u>Urbano</u>, '<u>Apprendi</u> distinguishes a "sentencing factor" – a "circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence within the range authorized by the jury's finding that the defendant is guilty of a particular offense" – from a "sentence enhancement" – "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict" constituting "an increase beyond the maximum authorized statutory sentence." [Citation.]' [Citation.] Nothing in <u>Southern Union Co.</u> alters that holding. Under the applicable version of section 1202.4, subdivision (b)(1), absent compelling and extraordinary circumstances, the trial court was required to impose a restitution fine in an amount between $200 and $10,000. The $10,000 section 1202.4, subdivision (b) restitution fine imposed in the present case was within that statutory range. The trial court did not make any factual findings that increased the potential fine beyond

what the jury's verdict – the fact of the conviction – allowed. Therefore, Apprendi and its progeny do not preclude its imposition. [Citation.]" (Id. at pp. 351-352.)

In People v. Pangan (2013) 213 Cal.App.4th 574 (Pangan), the Fourth District, Division 3 held that Southern Union did not require a jury trial on an order for victim restitution."[N]either Southern Union, Apprendi nor Blakely have any application to direct victim restitution, because direct victim restitution is not a criminal penalty. As explained in U.S. v. Behrman (7th Cir. 2000) 235 F.3d 1049, 1054, direct victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits. It is not increased 'punishment.' The [People v. Millard (2009) 175 Cal.App.4th 7, 35] decision makes the same point in regard to California law. [Citations.] [There are] numerous federal cases also holding victim restitution does not constitute increased punishment for crime. [Citation.] And we would note the restitution statute itself characterizes victim restitution awards as civil. [Citation.] [¶] Federal courts have also rejected Apprendi challenges to victim restitution statutes because those statutes, like the one before us, carry no prescribed statutory maximum. [Citations.]" (Pangan, supra, 213 Cal.App.4th at pp. 585-586.)

We agree with the reasoning expressed in Kramis and Pangan. As explained in Kramis, the defendant was not entitled to a jury trial on the imposition of restitution fines imposed pursuant to section 1202.4, subdivision (b) or section 1202.45 because those fines were within a range prescribed by statute. And explained in Pangan, the defendant was not entitled to a jury trial on the restitution award to Smith's family for his funeral expenses because direct victim restitution is not increased punishment.

People v. Bowman, 2013 Cal. App. Unpub. LEXIS 7559 at 38-49.

## 2.    Analysis

Petitioner challenges the imposition of a $10,000 restitution fine and a victim restitution fine of $6,451.69. Specifically Petitioner challenges the trial court's increase in the size of the restitution fine as a violation of his rights under Apprendi, 530 U.S. 466.

Even though this claim is based on Supreme Court law, it is not cognizable on federal habeas review. A federal court may entertain a habeas petition "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Ninth Circuit has held that "§ 2254(a) does not confer jurisdiction over a state prisoner's in-custody challenge to a restitution order imposed as part of a criminal sentence." Bailey v. Hill, 599 F.3d 976, 981-82 (9th Cir. 2010); see also United

1   States v. Thiele, 314 F.3d 399, 400 (9th Cir. 2002) (claim challenging a restitution fine is

2   not cognizable basis for habeas relief because such claims do not challenge the validity

3   or duration of confinement); United States v. Kramer, 195 F.3d 1129, 1130 (9th Cir.

4   1999) (same); Williamson v. Gregoire, 151 F.3d 1180, 1183 (9th Cir. 1998) (imposition of

5   fine is "merely a collateral consequence of conviction" and, as such, is not sufficient to

6   establish federal habeas jurisdiction). Petitioner's sole claim does not provide a

7   cognizable basis for habeas relief. Petitioner is not entitled to relief with regard to his

8   third claim. Petitioner's third claim challenging his restitution fines is hereby denied.

9   **V.   Conclusion**

10        Petitioner is not entitled to relief with regard to the claims presented in the instant

11   petition. The Court therefore orders that the petition be DENIED.

12   **VI.   Certificate of Appealability**

13        A state prisoner seeking a writ of habeas corpus has no absolute entitlement to

14   appeal a district court's denial of his petition, and an appeal is only allowed in certain

15   circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). The controlling statute

16   in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which

17   provides as follows:

18
19        (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

20
21
22        (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

23
24        (c)   (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

25
26                (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

27
28                (B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that no reasonable jurist would find the Court's determination that Petitioner is not entitled to federal habeas corpus relief wrong or debatable, nor would a reasonable jurist find Petitioner deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**VII.   Order**

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED;

2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   December 23, 2016          /s/ Michael J. Seng

                                    UNITED STATES MAGISTRATE JUDGE